

FILED
SEP 17 2012
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
Pierre Central Division

Bennett County Hospital & Nursing Home,

    Plaintiff,

v.

Case No. 12-3028

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
KATHLEEN SEBELIUS, in her official
capacity as the Secretary of the United States
Department of Health and Human Services,
INDIAN HEALTH SERVICE, AND
THE UNITED STATES OF AMERICA,

    Defendants.
_____/

## COMPLAINT

Plaintiff, Bennett County Hospital & Nursing Home, by and through Don Bruce, Attorney at Law, files this action against Defendants and state:

NATURE OF THE ACTION

1. The U.S. Constitution, Article 1, Sec. 8, Clause 3, provides Congress shall have the power to regulate commerce with ... Indian tribes.

2. Defendant, The United States of America, hereinafter Federal Government, signed the Treaty of 1868 with the Oglala Sioux Tribe, Articles 4, 5, 9, and 13, guaranteeing Oglala Sioux Tribal members medical care.

3. "An Act authorizing appropriations and expenditures for the administration of Indian Affairs, and for other purposes, approved November 2, 1921 (25 U.S.C. 13) (commonly known as the Snyder Act);" put, among other things, the Treaty of 1868 with the Oglala Sioux Tribe health care provisions into the U.S. Code. The Snyder Act authorized Congress to appropriate funds and authorized the Administration to expend funds "For the employment of inspectors, supervisors, superintendents, clerks, field matrons, farmers, *physicians*, Indian police, Indian judges, and other employees." Emphasis added.

4. The Snyder Act was amended by the Transfer Act. The purpose of Public Law 568, also the Transfer Act, August 5, 1954 [H. R. 303], Chapter 658 was "To transfer the maintenance and operation of hospital and health facilities for Indians to the Public Health Service, and for other purposes." In 1954, the Indian Health Service (IHS) was transferred to Public Health Service (PHS); which was under the Department of Health, Education, and Welfare (DHEW). DHEW was reorganized to the current Department of Health and Human Services (DHHS) in 1980, under President Jimmy Carter.

5. The Snyder Act, was further modified by the Indian Healthcare Improvement Act (IHCIA), P.L. 94–437, approved September 30, 1976, 90 Stat. 1400, 25 U.S.C. 1603 - 1654, mandates specific provisions which the IHS is to provide to Indians.

6. IHCIA, Sec. 4, 25 U.S.C. 1603, mandates the type of services and location for said services, which Plaintiff falls into, with Plaintiff's provision of services to its patient base.

7. IHCIA, Sec. 801. 25 U.S.C. 1671 provides for the President to request funds from

Congress for the payment of care provided to Indians within the IHS facility or from a "referral service." Plaintiff is a "referral service."

8. The IHCIA, Public Law 94-437, expired on September 30, 2000, and was extended through 2001 in anticipation that Congress would consider the re-authorization proposals pending in Congress. Since 2001, the Congress has held hearings on the re-authorization proposals.

9. The IHCIA, now the cornerstone legal authority for the provision of health care to American Indians and Alaska Natives, was made permanent when the President signed the bill on March 23, 2010, as part of the Patient Protection and Affordable Care Act (PPACA).

10. This Court held that the IHS is not a residual payer or 581 F.2d 697 provider of health care to Indians, and more specifically this Court said the IHS must pay for health care which Indians receive from health carte providers other than the IHS facilities. *White v. Califano*, 437 F.Supp. 543 (D.S.D.1977), affirmed *White v. Califano v. Califano*, 581 F.2d 697 (8th Cir. 1978).

JURISDICTION AND VENUE

11. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U. S. Constitution, Art. 3, Sec 2, Treaties and laws of the United States. Section 1331 reads, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (e)(3) because no real

property is involved, the district is situated in South Dakota, and the defendants are agencies of the United States or officers thereof acting in their official capacity.

## PARTIES

13. Plaintiff, Bennett County Hospital and Nursing Home, is a general medical and surgical hospital in Martin, SD, with 54 beds; and provides emergency and hospital care to Defendant IHS' Native American patients, when said patients present themselves to Plaintiff either at the emergency room or for inpatient hospital care.

14. DHHS is a federal agency of the United States, and oversees the administration of health care services to American Indians by the IHS.

15. Kathleen Sebelius is the Secretary of the DHHS, and is named as a party in her official capacity.

16. The IHS is a federal agency within the DHHS of the United States, and the IHS administers health care services to American Indians.

## FACTS AND OR BACKGROUND

17. The IHS operates the Pine Ridge Service Unit and or Pine Ridge Hospital, P.O. Box 1201, East Highway 18, Pine Ridge, South Dakota 57770; on the Pine Ridge Oglala Lakota (Sioux) Indian Reservation (Reservation).

18. Pursuant to the Federal Register, 6-21-2007:

> SUMMARY: The purpose of this notice is to revise and update the list of Contract Health Service Delivery Areas (CHSDA) as defined in 42 CFR part 136, Subparts A-C and Service Delivery Areas (SDA) as established by the Director,

      Indian Health Service (IHS) administratively to effectuate the intent of Congress. This list replaces and supplements the FR notice dated January 10, 1984 (49 FR 1291) establishing CHSDAs and FR notice dated August 25, 1988 (53 FR 32460) establishing Health Service Delivery Areas (HSDAs).

      Oglala Sioux Tribe (Pine Ridge Bennett [County], SD, Cherry, NE, Reservation). Custer, SD, Dawes, NE, Fall River, SD, Jackson, SD, Mellete, SD, Pennington, SD, Shannon, SD, Sheridan, NE, Todd, SD, Washabaugh, SD.

19. Note, Bennett County in its entirety is within the Pine Ridge Hospital CHSDA or SDA.

20. Recent reports shed some light on the facts about the Indian Patient population in on the Pine Ridge Reservation. Bennett County, South Dakota:

- As of 2011, population estimates of the reservation range from 28,000 to 40,000;
- 80% of residents are unemployed (versus 10% of the rest of the country);
- 49% of the residents live below the federal poverty level (61% under the age of 18);
- The infant mortality rate is 5 times higher than the national average;
- Native American amputation rates due to diabetes is 3 to 4 times higher than the national average;
- Death rate due to diabetes is 3 times higher than the national average;
- And life expectancy in 2007 was estimated to be 48 for males and 52 for females.

21. Tribal planning statistics from the Internet, provided information in paragraphs 17-15.

22. The Reservation sits in Bennett, Jackson, and Shannon Counties and is located in the southwest corner of South Dakota, fifty miles east of the Wyoming border.

23. The 11,000-square mile (approximately 2.7 million acres) Reservation is the second-largest Native American Reservation within the United States. It is roughly the size of the State of Connecticut. According to the Oglala Sioux tribal statistics, approximately 1.7 million acres of this land are owned by the Tribe or by tribal members.

24. The Reservation is divided into eight districts: Eagle Nest, Pass Creek, Wakpamni, LaCreek, Pine Ridge, White Clay, Medicine Root, Porcupine, and Wounded Knee.

25. The topography of the Pine Ridge Reservation includes the barren Badlands, rolling grassland hills, dryland prairie, and areas dotted with pine trees.

26. There is little industry, technology, or commercial infrastructure on the Reservation to provide employment.

27. The nearest hospital to Plaintiff is located in Gordon, Nebraska, which is a private hospital and half the size (25 beds) of Plaintiff hospital.

28. Rapid City, South Dakota (population approximately 57,700) is located 120 miles from the Reservation.

29. The number of Indians in Martin South Dakota is 2,241, or 65.3% of the population in Bennett County. As of the 2010 census there were 3,431 people in Bennett County, in 1,090 households (98.9% of the population was in households). There are 712 households that are Indian. The racial and ethnic composition of the population was 33.3% non-Hispanic white, and 65.3% of the population reported being Native American. The remainder of the population of 1.4 % is non-Indian and non-white, or any race.

30. All of the Indian population at Martin, Bennett County, South Dakota reside within the Pine Ridge Hospital's CHS delivery area CHSDA or SDA, pursuant to paragraph # 17, *supra*.

31. Plaintiff Hospital is located approximately 47 miles east of the Pine Ridge Hospital, on U.S. Highway No. 18.

32. The drive to the Pine Ridge Hospital from Martin South Dakota takes from 50 minutes to an hour, depending on the weather and road conditions.

33. The Pine Ridge Hospital has 45 beds, serves the Indian population of more than 17,000

situated on the Reservation, and is the largest in the Aberdeen Area IHS.

34. When fully staffed, the Pine Ridge Hospital has 16 physicians and sees medical, obstetrical, pediatric, and surgical patients.

35. The Pine Ridge Hospital also includes the Kyle and Wanblee South Dakota Health Centers; and three health stations located at Allen, Manderson, and Porcupine, South Dakota.

36. Even if Indian patients from Bennett County were to present at Kyle and Wanblee South Dakota Health Centers; and three health stations located at Allen, Manderson, and Porcupine, South Dakota, these small health facilities could not provide the necessary care and these facilities would be required to divert the care to another larger health care facility.

37. The Emergency Medical Treatment and Active Labor Act (EMPTALA) requires a health care facility, at a minimum, to complete a medical screening exam, provide stabilization and then, if necessary, transfer the patient to a larger facility.

38. Under the EMPTALA Plaintiff cannot simply deny care to Indian patients in Bennett County. Plaintiff cannot refer the Indian Patients to the Pine Ridge Hospital without at a minimum, completing a medical screening exam, providing stabilization and then, if necessary, transferring the patient to Pine Ridge Hospital.

39. Once Plaintiff begins emergency treatment to an Indian patient in Bennett County, Plaintiff a must continue providing care to constrain medical liability risks; since diverting patient care could involve complications during the transfer.

40. From the demographic data presented *supra*, most Indian patients in Bennett County do

not have the resources to travel to the Pine Ridge Hospital.

41. Gas prices have risen nearly to the $4.00 per gallon mark.

42. Not every Indian patient in Bennett County has a reliable vehicle.

43. Neither Defendants nor the Tribe provides transportation to the Indian patient population from Bennett County.

44. There is no way to travel to the Pine Ridge Hospital for most of the Indian patients in Bennett County, to obtain routine, critical, and emergency medical care from the IHS.

45. Defendants do not provide emergency medical service to the Indian patient population from Bennett County.

46. Plaintiff provides emergency medical service to the Indian patient population from Bennett County.

47. Even if Indian patients from Bennett County were to present at the Pine Ridge Hospital, more than likely the Indian patient Bennett County could not be seen at the Pine Ridge Hospital and the Indian patient Bennett County would have to be diverted/transferred elsewhere under the Indian patient Bennett County.

48. For Plaintiff to transfer an Indian patient from Bennett County to the Pine Ridge Hospital would have been futile; as the patient would have been transferred from the Pine Ridge Hospital to another health care provider or quite possibly transferred back to Plaintiff hospital fort he following reasons.

49. What follows is a part of a report to the Committee on Indian Affairs by the Chairman, Byron L. Dorgan.

    In Critical Condition: The Urgent Need to Reform the Indian Health Service's

Aberdeen Area
Report of Chairman Byron L. Dorgan
To the Committee on Indian Affairs
One Hundred and Eleventh Congress - Second Session
December 28, 2010

On September 28, 2010, the Committee held a hearing on its investigative findings. During the course of this hearing the Chairman identified deficiencies in management, employee accountability, financial integrity, and oversight of IHS' Aberdeen Area facilities. The Chairman determined that these weaknesses have contributed to reduced access and quality of health care services available to patients served in the Aberdeen Area.

Provided below is a detailed summary of the findings of the investigation. In brief, the Chairman found:

Three service units experienced substantial and recurring diversions or reduced health care services from 2007 to 2010, which negatively impacts patients and quickly diminishes limited Contract Health Service (CHS) funding.

Mismanagement of CHS program funding has resulted in some facilities having funding surpluses and the transfer of dollars to likely non-CHS programs.

**Five IHS hospitals are at risk of losing their accreditation or certification from the Centers for Medicare and Medicaid Services (CMS) or other deeming entities.**

Several Aberdeen Area facilities were cited as having providers with licensure and credentialing problems, Emergency Medical Treatment and Active Labor Act (EMTALA) violations, emergency department deficiencies or other conditions that could place a patient"s safety at risk.

Particular health facilities continue to have significant backlogs in posting, billing and collecting claims from third party insurers (i.e., Medicare, Medicaid and private insurers). One facility repeatedly transferred its third party payments to other facilities in the Aberdeen Area.

There were lengthy periods of senior staff vacancies in the Clinical Director and Chief Executive Officer positions, resulting in inconsistent management and leadership at Aberdeen Area facilities.

**Substantial Diverted Health Care Services.** Generally, health care services are diverted, including service reductions, when an IHS facility determines that it will not accept patients for certain treatment or care, thereby diverting patients to another facility. However, **a hospital cannot close its emergency department and is obligated under the Emergency Medical Treatment and Active Labor Act (EMTALA) to, at a minimum, complete a medical screening exam, provide stabilization and then, if necessary, transfer the patient**. Diverted health care services are due to a range of issues, including a shortage of providers, inadequate reimbursement from public and private insurers, and lack of bed availability.

**Mismanagement of Contract Health Service Funding.** The CHS program funds health care services for Native Americans when they must go outside the Indian health care facility system. CHS supplements the direct health care provided at Indian health facilities.

The IHS and tribes contract with private providers when the Indian health program is unable to provide care, either because there is no Indian health facility or the existing Indian health facility is incapable of providing the service needed. CHS can include primary health care, routine and emergency ambulatory care, hospital stays, laboratory tests, pharmacy, and diagnostic imaging and screening services. Currently, the IHS and tribes contract with more than 2,000 private health care providers.

In order for CHS to pay for health care services, a patient must follow a specific approval process established by the IHS. There are essentially two tracks by which a patient seeks care through the CHS program: (1) a self-referral; or, (2) an approval from the Indian health program"s CHS Review Committee, in conjunction with a clinician referral where an Indian health facility is present. Each tribe or Indian health program has a CHS Review Committee that is charged with reviewing each CHS case and must determine on a case-by-case basis whether the care should be covered.

Through the years, the Chairman has learned that CHS funding is generally rationed due to funding constraints. Many tribes have informed the Committee that Priority I cases that cover "life or limb" situations run out of needed funding by June of each year. Many tribal members have reported extreme numbers of denials and deferrals of CHS cases due to funding shortfalls.

IHS facilities are supposed to create monthly budgets for CHS funding and allocate funds on a priority basis so that the funds last through the end of each year. However, based upon data submitted by IHS Aberdeen Area facilities often end the year with a surplus of CHS funding. For instance, in FY2007 facilities had a total of $6.8 million in excess CHS funding, in FY2008 $2.4 million and in FY2009 $2.9 million.

**Mismanagement of Third Party Billing.** The Indian Health Care Improvement Act authorizes IHS to collect reimbursement for services provided at IHS facilities from third party insurers, such as Medicare, Medicaid, and private health insurers. Third party billing is an essential revenue generator for facilities and, in some cases, has enabled facilities to provide enhanced services to patients.

Based on data received from IHS most facilities suffer from backlogs in posting third party claims within the required time frame and have failed to collect on all claims billed. IHS' Aberdeen Area Administrative Review Report completed in April 2010 demonstrates the persistence of backlogs in coding and billing, which stalls the recoupment of third party payments. For instance, certain facilities failed to bill inpatient and outpatient claims within the required time frame of ten days and six days, respectively.

**At-Risk: Facility Accreditation or Certification.** The investigation

      identified multiple instances of IHS facilities receiving poor evaluations and being placed on notice for possible loss of accreditation. According to IHS' April 2010 review of the Aberdeen Area, five facilities were at risk of losing accreditation. IHS concluded in its April 2010 review that the "loss of accreditation would have devastating effects on these Service Unit budgets and severely restrict program operations." Described below, the Majority Staff identified a total of six facilities with accreditation problems and/or EMTALA violations.

      Accreditation is the process through which hospitals and other health care facilities are evaluated on their quality of care, treatment and services provided, based on established standards of performance in the health care industry. CMS or a handful of organizations, called "deeming organizations," perform triennial surveys and inspections of IHS health care facilities and provide the accreditation or certifications that are recognized throughout the industry.

      The most prominent of these groups is the Joint Commission, which has "deeming" authority from CMS, meaning that any hospital meeting the Joint Commission"s conditions also satisfies the CMS conditions for reimbursement. The Joint Commission typically evaluates facilities once every three years. If a facility does not meet the necessary conditions for accreditation, the Joint Commission will place the facility on notice and typically require that improvements be made within 90 days or risk losing its accreditation.

      **Through the investigation the Chairman identified certain at-risk facilities given the information that IHS submitted. Specifically, the investigation revealed that IHS hospitals located at Pine Ridge Service Unit, .... had substantial accreditation and EMTALA issues.**

      For instance, **a CMS report from March 19, 2010, notes that Pine Ridge Hospital received a number of EMTALA complaints in 2009 and 2010, which centered on insufficient care in its Emergency Department**. In addition, in November 2010, CMS reviewed Rapid City IHS Hospital"s corrective action plans in response to a May 2005 EMTALA complaint (fifth revisit) and a September 2008 EMTALA complaint (second revisit). CMS determined that the Hospital"s corrective action plans were unacceptable, requiring the facility to submit more responsive plans in order to avoid jeopardizing its accreditation.

Emphasis added in some paragraphs which reflect on the Pine Ridge Hospital.

50.    Senator Dorgan's investigation is supported by recent events in the Aberdeen Area IHS and at the Pine Ridge Hospital.

51.    Elizabeth Garcia Janis, Chief Medical Director, Pine Ridge Hospital, wrote an email to the Dr. Yvette Roubideaux, IHS Director, Rockville Maryland, setting forth the facts in

paragraphs 48-56 *infra*.

52. In 2010 or there about, the CMS evaluated the Pine Ridge Hospital and issued the Hospital an Immediate Jeopardy (I. J.) rating.

53. The CMS IJ rating of the Hospital reflected the Pine Ridge Hospital's inability to meet minimum standards established by CMS to collect Medicare and Medicaid funds for medical services provided to Indian patients.

54. The Pine Ridge Hospital, through its medical and executive staff, put together a plan of correction to remove the IJ rating.

55. The plan was nearly complete and the Pine Ridge Hospital medical and executive staff scheduled a meeting with Ms. Shelly Harris, Assistant Director, Field Operations, Aberdeen Area IHS (Ms. Harris) on August 2, 2011 to obtain approval for implementation.

56. At August 2, 2011 meeting, Ms. Harris removed William Pourier, CEO at the Pine Ridge Hospital, and sabotaged the plan of correction to remove the IJ rating.

57. Mr. Pourier has since filed an EEO complaint against the IHS, and in his complaint, Mr. Pourier makes similar allegations to what Dr. Garcia Janis has said in her email to Dr. Roubideaux.

58. In addition, Ms. Gloria Belgarde, former Director of Nursing at the Belcourt, North Dakota IHS Hospital, was permanently re-assigned to the Pine Ridge Hospital to assist in the removal of the IJ.

59. Ms. Belgarde has filed an EEO complaint against the IHS for constructive removal.

60. These individuals will sign affidavits with their testimony for Plaintiff's briefs in this

12

action.

61. Along with the deficiencies uncovered by Senator Dorgan, and with the deficiencies alleged by Dr. Garcia Janis, Mr. Pourier, and Ms. Belgarde, Defendant were in position to provided medical service to the Indian patient population from Bennett County, even if said Indian patient population from Bennett County would have presented at the Pine Ridge Hospital.

62. These fact do not excuse Defendants from their legal obligation to provide medical care to the Indian patient population from Bennett County.

63. Meanwhile, Plaintiff is caught in a dilemma; not only is Plaintiff the only medical care available to the Indian patient population from Bennett County, under the EMTALA Plaintiff is required to provide medical care regardless of whether Defendant IHS will ever reimburse Plaintiff for said medical service provided.

64. Defendant IHS is aware of Plaintiff's dilemma, and is taking full advantage of it and that is why Defendant IHS is not masking any real effort to reimburse plaintiff for $1,647,567.96, and mounting with interest and new emergency room and clinic visits from the Indian patient population in Bennett County

65. Defendant IHS have intentionally absent in providing the Indian patient population from Bennett County with medical services an or health care pursuant to a federal treaty with the Oglala Sioux Tribe, and subsequent federal laws which embody the intent of the treaty. This inaction by Defendant IHS has left the IHS obligation in the hands of Plaintiff under the EMTALA.

CAUSES OF ACTION

COUNT I

66. Plaintiff re-alleges, adopts, and incorporates by reference paragraphs 1 through 64 above as though fully set forth herein.

67. Plaintiff has provided the following emergency medical services and clinic care to Indian patient population from Bennett County during the time periods showing the medical bills totaled for the time period.

Accounts entered as IHS financial class

| Date Ranges | IHS Charges |
|---|---|
| October 1, 2007 - September 30, 2008 (APS partial year) | $262,846.00 |
| October 1, 2008 - September 30, 2009 | $454,753.00 |
| October 1, 2009 - September 30, 2010 | $417,379.00 |
| October 1, 2010 - September 30, 2011 | $605,337.00 |
| October 1, 2011 - March 27, 2012 | $451,463.00 |
| **TOTAL MEDICAL CHARGES** | **$2,282,778.00** |

Payments made by IHS

| Dates | Amount of Payment |
|---|---|
| January 1, 2008 to September 31, 2008 | $159,095.02 |
| October 1, 2008 to September 31, 2009 | $160,618.38 |
| October 1, 2009 to September 31, 2010 | $110,570.89 |
| October 1, 2010 to September 31, 2011 | $153,435.40 |
| October 1, 2011 to September 31, 2012 | $ 51,490.35 |
| **TOTAL IHS PAYMENTS** | **$635,210.04** |

Balance due Plaintiff by Defendant IHS is **$2,282,778.00** less **$635,210.04** =

**TOTAL DUE** (less interest, attorney fees, and costs)   **$1,647,567.96**.

**NOTE**: Plaintiff has all invoices to support amount Defendant IHS owes, and Plaintiff has all payment receipts for amounts Defendant IHS has paid. These documents are scanned into PDF format and provided to the Court and Defendants as exhibits.

PRAYER FOR RELIEF

WHEREFORE Plaintiffs demand:

(1) Judgment against Defendants for $1,647,567.96 and interest; (2) That Plaintiffs be awarded attorney fees; (3) That Plaintiffs be awarded $350.00 for court filing fees, and disbursements for service of process.

DATED September 12, 2012.

FOR PLAINTIFF:

*/s/ Don Bruce*

Don G. Bruce, Esq., MBA
SD Bar # 2407
P.O. Box 674
Belcourt, North Dakota 58316
Ph.    701-477-8755
FAX   701-477-8772
Email *michif0@yahoo.com*